

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-12-2008

# USA v. Edwards

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-3170

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Edwards" (2008). *2008 Decisions*. Paper 1625.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1625

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-3170
_____

UNITED STATES OF AMERICA

v.

DOUGLAS EDWARDS,

Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 02-cr-00662)
District Judge: Mary A. Laughlin

_____

Argued October 17, 2007
Before: FISHER, ALDISERT and GREENBERG, *Circuit Judges*.

(Filed: February 12, 2008)

Anna M. Durbin (Argued)
50 Rittenhouse Place
Ardmore, PA 19003
    *Attorney for Appellant*

Karen L. Grigsby (Argued)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
    *Attorneys for Appellee*

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

Douglas Edwards appeals from his conviction for possession of a firearm which has been shipped or transported in interstate commerce by a person who has been convicted of a crime punishable by imprisonment for a term exceeding one year. 18 U.S.C. § 922(g)(1). On appeal, he argues that (1) the Government's acknowledged failure to turn over evidence that could have been used to impeach the primary witness for the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); (2) the Government's peremptory strike of a 70-year old, African-American female juror on the basis of her age and her status as a "political person" violated *Batson v. Kentucky*, 476 U.S. 79 (1986); (3) the District Court confused the jury in the way it defined the terms "constructive possession" and "knowing" in its jury charge; and (4) his sentence was unreasonable in light of his age and other factors. For the reasons set forth below, we will affirm the judgment of the District Court.

## I. Factual Background

We write exclusively for the parties, who are familiar with the factual context and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

2

On March 23, 1999, Douglas Edwards was involved in an altercation with his former girlfriend, Dawn Matthews. Allegedly, Matthews, who had been waiting outside of Edwards' home in South Philadelphia to give him a birthday present, verbally and physically assaulted Edwards' new girlfriend, prompting Edwards to punch Matthews in the eye. Matthews then drove to a nearby gas station, called 911, and reported the incident to the responding officers (one of whom was Officer Fidler). She then proceeded to the police station where she filed a formal police report. In addition, she filed a complaint (known as a "CAP") against a rogue police officer with Cpl. Sidebotham in which she alleged that the rogue officer was a friend of Edwards and was helping him to elude police. As Matthews was leaving the police station, she happened to see Edwards drive by and hailed a patrol car operated by Officer Flagler and another officer. After explaining that she had seen Edwards, she rode along with police in what became a high-speed chase involving a number of officers. Ultimately, with Matthews' help, the police apprehended Edwards and recovered a gun from under the dashboard of his car.

Edwards was charged with possession of a firearm which has been shipped or transported in interstate commerce by a person who has been convicted of a crime punishable by imprisonment for a term exceeding one year. At trial, his primary defense was that Matthews had planted the gun in his car in an attempt to frame him. Edwards was subsequently convicted, but on the day scheduled for sentencing, the Government

3

revealed that it had inadvertently withheld police statements that could possibly have been used to impeach Matthews' testimony. The District Court found that while the statements were improperly withheld, the error was not material under the *Brady/Giglio* framework. Edwards was sentenced under the Armed Career Criminal Act ("ACCA") to 235 months in prison. This direct appeal followed.

## II. Jurisdiction and Standard of Review

We exercise jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Edwards presents a variety of claims which we will review under a number of different standards. With regard to Edwards' *Brady/Giglio* claim, we will review the conclusions of law *de novo* and findings of fact for clear error. *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). Whether the district court erred in concluding that the prosecutor was not motivated by discriminatory intent in striking a juror is a finding of fact, and is reviewed for clear error. *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002). Whether the district court applied the appropriate framework to the *Batson* analysis is a question of law and subject to plenary review. *Id.* at 283. Although we generally review jury instructions for abuse of discretion, our review is plenary when the question is whether a district court's instructions misstated the law. But where the issue is not preserved, as here, our review is limited to plain error. *United States v. Dobson*, 419 F.3d 231, 236 (3d Cir. 2005). We will review the sentence for

4

reasonableness under an abuse of discretion standard. *Gall v. United States*, 128 S. Ct. 586, 600 (Dec. 10, 2007).

## III. Discussion

### A. *Brady/Giglio* Claim

It is undisputed that a gun was found under the dashboard of the car Edwards was driving at the time of his arrest. Edwards' defense at trial was based on the theory that he had never possessed or known about the gun, and that Matthews had planted it there on the night of their altercation in order to frame him. Edwards presented evidence, including two witnesses, in support of this theory and the Government likewise presented evidence disputing it, relying primarily on Matthews' testimony, although the Government was also able to substantially undermine the impact of Edwards' witnesses' testimony on cross-examination. Matthews testified that she was aware of the gun because Edwards had often carried a gun in such a manner during their relationship. She also testified that she told police about the gun immediately before the arrest, a point the Government repeated in its closing argument. The jury implicitly rejected Edwards' version of the story when it convicted him of possession of that firearm.

Edwards was unaware that during trial, the Government was in possession of certain statements taken in the course of an Internal Affairs Division ("IAD") investigation of the alleged rogue officer. Among these statements, which were inadvertently withheld from Edwards until after the verdict, were at least two statements

5

made by officers involved in the Edwards investigation tending to show that Matthews first told the responding officers that Edwards possessed a gun at the time immediately following her 911 call, and again mentioned a gun to at least one officer at the precinct at some point after making her formal CAP. Edwards argues that the withholding of these statements violates *Brady/Giglio* because (1) he was not able to use the statements to impeach Matthews' testimony at trial, where she stated that she first told police that Edwards carried a gun immediately before Edwards was arrested; (2) the Government compounded the error by stating in its closing argument that Matthews "said nothing about a gun" to the responding officers; and (3) he was induced to agree to a false stipulation with Government that he would not have agreed to had he been aware of the withheld statements.[1] Edwards now argues that had these statements been available to him, the jury might have arrived at a different verdict, and therefore the Government's failure to turn the statements over violated *Brady/Giglio*.

*Brady*, relying on the Due Process Clause, requires the government to disclose any evidence in its possession that is favorable to the accused and material to either guilt or punishment. 373 U.S. at 87. *Giglio* extended this rule to include impeachment evidence as well as exculpatory evidence. 405 U.S. at 153-54. Good faith on the part of the

---

[1]Edwards presents arguments (2) and (3) as separate claims. Because all of these claims essentially relate to the timing of Matthews' revelation of the gun to the police, we will consider the cumulative effect of these claims and their relationship to the withheld statements in determining whether the statements were material under *Brady/Giglio*.

government is not a defense to such a violation. *United States v. Mitchell*, 365 F.3d 215, 254 (3d Cir. 2004). To establish a Due Process violation, "it must be shown that (1) evidence was suppressed; (2) the evidence was favorable to the defense; and (3) the evidence was material to guilt or punishment." *Risha*, 445 F.3d at 303.

The parties do not dispute that the IAD statements were suppressed and were at least marginally favorable to the defense under their theory of the case. Therefore, the remaining question is whether the suppression was material to the outcome. Evidence is material if it is reasonably probable that the result of the proceeding would have been different if the evidence had been available to the defense at trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985). A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.* In making this determination, we must give appropriate deference to the District Court, "given the difficulty inherent in measuring the effect of a non-disclosure on the course of a lengthy trial covering many witnesses and exhibits." *Risha*, 445 F.3d at 303 (internal citations and quotation marks omitted).

Matthews testified at trial that she first mentioned the gun to Officer Flagler immediately prior to the arrest of Edwards and the recovery of the gun from Edwards. Thus, the only withheld IAD statements with any impeachment value are those of Officer Fidler, one of the officers who first responded to her 911 call, and Cpl. Sidebotham, the officer who took the CAP regarding the rogue officer who supposedly helped Edwards

7

evade police capture. In his IAD interview, Fidler remembered "the complainant mentioning something about the gun," but told investigators, "I don't recall any of the specifics." Sidebotham told IAD investigators that Matthews, after submitting her formal CAP, told him that the rogue police officer "had given Edwards a gun that she thought was stolen. I told Sgt. Leo Costello about the incident and the gun. Later that night . . . Costello told me that there was a pursuit and Edwards was arrested. He said that a gun was recovered. At that time he did not know that it was stolen." In addition, in a memo he prepared the night of the incident, Sidebotham wrote that "Costello stated that [Matthews] told him that [identity redacted] gave the def [sic] a gun which turned out to be stolen."

Edwards argues that these statements show that Matthews repeatedly told police that Edwards had a gun from the time of the incident onward, and that her testimony regarding the timing of this revelation was false. He suggests that this supports the conclusion that Matthews planted the gun in an attempt to frame him. However, we agree with the District Court that "Matthews would not have acted the way she did on the night of the incident had she planted the gun to get the defendant in trouble" and that even if the jury had been aware that Matthews told police as early as her 911 call that Edwards kept a gun under his dashboard, this does not automatically prove that Matthews in fact desired to, or was able to, plant the gun in Edwards' vehicle.

8

The timing of Matthews' revelation about the gun, while potentially relevant, is only a small and circumstantial piece of evidence with limited probative value. The most reasonable inference is that Matthews was angry and hurt over the altercation, knew about Edwards' habit of keeping a gun because of her longstanding intimate relationship with him, and sought to do him harm by alerting police of its potential presence. For these reasons, and those articulated by the District Court in its lengthy discussion of this issue, *see U.S. v. Edwards*, No. 02-622, 2004 WL 2590503, *14 (E.D. Pa. Nov. 12, 2004) (unreported), the withholding of the statements does not sufficiently undermine confidence in the outcome, and thus, no *Brady/Giglio* violation has occurred.

### B. *Batson* Claim

Edwards also claims the District Court violated *Batson*, 476 U.S. at 84, when it allowed the prosecutor to use a peremptory strike against a seventy-year-old black woman and former member of the school board. Edwards makes essentially two claims: (1) that the prosecutor's two proffered race-neutral reasons for using a peremptory strike, her age and her affiliation with the school board (she was a "political person"), were pretextual, and that the strike was in fact motivated by racial discrimination, and (2) that excluding this juror on the basis of her age, in and of itself, violated the Equal Protection Clause. These claims are without merit.

Generally, a claim alleging bias in the use of peremptory strikes in a criminal trial is governed by the doctrine established in *Batson*, which held that the exclusion of

9

veniremen from a jury on the basis of race violated the Equal Protection clause of the Fourteenth Amendment. *See Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003).[2] Trial courts use a three-step framework to analyze such allegations of racial bias in the use of peremptory strikes: first, the opponent of the strike must make a prima facie showing that a peremptory strike has been exercised on the basis of race. The burden of production then shifts to the proponent of the strike to offer a race-neutral reason for the strike. In light of the parties' submissions, the Court must finally determine whether the opponent (who continues to bear the burden of persuasion throughout, *see*, *e.g.*, *Hardcastle v. Horn*, 368 F.3d 246, 256 (3d Cir. 2004)) has shown purposeful discrimination. *Id.*

Here, the prosecution offered the juror's age and political status as race-neutral bases for using a peremptory challenge. Edwards argues that age is not a good indicator of trustworthiness and should not be relied upon as a factor in selecting juries, but does not point to any evidence that age is somehow a proxy for race in this context, or that it is not the true motivation behind the strike. He also seems to argue that even if age was not offered as a pretext, it is, in and of itself, an impermissible basis upon which to peremptorily challenge a juror. This argument is meritless. Age, unlike race, is not subject to "strict scrutiny" in the traditional equal protection framework, and therefore does not warrant the same safeguards with respect to jury selection. *See Pemberthy v.*

---

[2]The *Batson* doctrine has been extended to federal prosecutions through the Fifth Amendment and generally has been applied using the same analytical framework. *United States v. Milan*, 304 F.3d 273, 281 (3d Cir. 2002).

10

*Beyer*, 19 F.3d 857, 870-71 (3d Cir. 1994). Therefore, peremptory challenges on the basis of age are generally permissible. Moreover, Edwards gives only cursory attention to the second reason offered by the prosecutor – the desire to keep "political" people, in this case a school board member, off the jury. While Edwards suggests that a strike on such a basis is undesirable as a policy matter, as a matter of law it constitutes a legitimate race-neutral reason, and Edwards has not carried the burden of showing that this rationale was pretextual or otherwise impermissible. Thus Edwards has not shown purposeful discrimination with respect to selection of the jury.

### C. Confusing Jury Instruction Claim

Edwards also contends that the District Court's instruction to the jury regarding constructive possession of a firearm was "confusing" and "unintelligible." These claims are groundless. Edwards essentially argues that the jury might have interpreted the court's distinction between "direct" and "indirect" control as stating that Edwards could be found to have had possession of the gun, even if he was not aware that it was in the car, as long as he knew that the object was, in fact, a gun. However, the Court's instruction, regardless of the choice of language, is correct as a matter of law. The Court's instruction, taken *in toto*, adequately explained the concept that "possession" may be "actual" or "constructive," and that such possession must have additionally been "knowing" for the defendant to be found guilty. While it is always possible that a jury may be confused by a poorly articulated instruction, it seems highly unlikely that the jury

11

was confused in this instance. The question of whether Edwards or Matthews placed the gun under the dashboard was the central issue in the case. After deciding that question, applying the legal concept of possession is relatively intuitive and not highly complicated in this context. Moreover, the issue was not preserved for review because Edwards did not object to the instructions at the time or ask for any point to be clarified. Regardless, the instruction was correct as a matter of law and the District Court did not abuse its discretion in the manner in which it articulated the legal concepts explained therein.

### D. Unreasonable Sentence Claim

Finally, Edwards argues that his sentence was unreasonable because the District Court "mechanically" applied the Armed Career Criminal Act and did not consider factors such as a lowered risk of recidivism for people in Edwards' age category.

The Presentence Investigation Report ("PSR") calculated that Edwards had an adjusted offense level of 30 after calculating a base offense level of 24 and adding enhancements for the stolen gun, his attempts to evade police, and subsequent allegations of obstruction of justice. Because the District Court found that there was not substantial evidence of obstruction of justice, it recalculated and found an adjusted offense level of 28. However, the District Court agreed with the PSR that Edwards was an armed career criminal under the ACCA, 18 U.S.C. § 924(e). Because of this, the District Court observed that his offense level automatically became 33 under ACCA and U.S.S.G. § 4B1.4(b)(3)(B), regardless of whether his original adjusted base offense level was

12

calculated as 28 or 30. Combined with his Criminal History Category of VI, the Court found an advisory range of 235 to 293 months. The ACCA also carries with it a mandatory minimum sentence of 15 years. After considering the factors set forth in 18 U.S.C. § 3553(a), the District Court imposed a sentence of 235 months, the lowest possible within-Guidelines sentence. In explaining its decision, the Court stated that "there is hope for Mr. Edwards and I don't think the high end of the guidelines is necessary."

There is no dispute that Edwards is an armed career criminal or that the guideline range resulting from the ACCA application was correctly calculated. And contrary to Edwards' contention, the District Court did not "mechanically" apply the ACCA to his sentencing determination. As it has been instructed to do, the District Court scrupulously considered and applied the § 3553(a) factors, including § 3553(a)(4), which directs courts to correctly calculate and consider the Guidelines range before imposing a sentence. *United States v. Booker*, 543 U.S. 220, 264-65 (2005); *United States v. Cooper*, 437 F.3d 324, 331 (3d Cir. 2006). Applying the ACCA and precisely calculating the resulting recommended Guidelines range thus constitutes part of the application of § 3553(a), and therefore Edwards' argument that the ACCA was applied "mechanically" necessarily fails.

Edwards further argues that the District Court should have given greater weight to his age and marital status in making its sentencing determination. As discussed above, in

13

evaluating whether the District Court abused its discretion, we look to see whether the Court considered all of the factors set forth in 18 U.S.C. 3553(a). *Booker*, 543 U.S. at 264-65; *Cooper*, 437 F.3d at 331. The Court carried out this analysis. It considered Edwards' criminal history, calling it "probably the worst record" he'd seen in five years; Edwards' assault on Matthews and his flight from police; the need to protect society from repeat offenders; and Edwards' need to learn to control his anger. Edwards has been a persistently violent person and has continuously engaged in criminal behavior for the greater part of his life. While it may be true that in general, older, married individuals have lower rates of recidivism, Edwards was only thirty-nine at the time of conviction and has not shown any signs of tempering his conduct. Where the District Court has carefully applied the § 3553(a) factors, it is not obligated to discuss every argument made by the defendant as to why his sentence should be different. *Cooper*, 437 F.3d at 329. Defendant has therefore not met his burden of showing that the District Court abused its discretion by not applying a below-Guidelines sentence in light of his age and marital status and that his sentence is unreasonable. *Id.* at 332; *see also Gall*, 128 S. Ct. at 600.

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.