994 A.2d 820

**Abdel Khader DIALLO**

v.

**STATE of Maryland.**

**No. 91, Sept. Term, 2009.**

Court of Appeals of Maryland.

May 10, 2010.

Reconsideration Denied June 17, 2010.

Philip J. Sweitzer, Columbia (Ronald I. Kurland of Kurland & Kurland, P.A., Baltimore), on brief, for petitioner/cross-respondent.

Mary Ann Ince, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

Abdel Khader Diallo (Petitioner) was convicted in December 2007 in the Circuit Court for Baltimore County of first degree assault, in violation of Maryland Code (2002 & Supp.2009), § 3–202 of the Criminal Law Article, and use of a handgun in the commission of a crime of violence, in violation of § 4–204 of the Criminal Law Article. Prior to trial and post-judgment, Diallo asserted in the Circuit Court that its exercise of jurisdiction over him was improper because he enjoyed derivative diplomatic immunity by virtue of the fact that his father was

an Assistant Secretary–General of the United Nations (the "UN"). The trial court denied his motion to dismiss the indictment and his motion for a new trial on that ground. The Court of Special Appeals dismissed Diallo's appeal in part and affirmed the convictions otherwise. *Diallo v. State,* 186 Md. App. 22, 972 A.2d 917 (2009). For the reasons that follow, we shall vacate the judgment of the intermediate appellate court dismissing a portion of the appeal and hold instead that Diallo failed to establish before the trial court that, at the time of his offenses or arrest,[1] he enjoyed derivative diplomatic immunity. The Court of Special Appeals was correct, however, to have found no *Brady*[2] violation regarding Diallo's claim that the prosecutor failed to supply Petitioner with correct information reputed to be in the knowledge or possession of the U.S. Department of State as to his father's diplomatic status.

## FACTUAL AND PROCEDURAL BACKGROUND

Petitioner received a bench trial in the Circuit Court based on a not guilty plea and an agreed statement of facts. We

---

1. Petitioner, in his brief, pins his flagship challenge on the contention that he enjoyed derivative diplomatic immunity at the time of his arrest; yet, at oral argument, he focused on the notion that he enjoyed immunity at the time of the offense, which occurred approximately ten days before his arrest. Although without an evidentiary basis in the trial record to do so, Petitioner claims in his brief, in connection with his immunity assertion, that his father was in the United States on diplomatic business on the date of the offense.

 We suggested, without deciding expressly, that the relevant date to consider in an analysis of a claim of diplomatic immunity is the date of the offense. *See Traore v. State,* 290 Md. 585, 592, 597, 431 A.2d 96, 100, 102 (1981) (holding that the Vienna Convention, newly enacted at that time by the United States, did not apply retrospectively, to acts committed while the repealed statute was in effect). It appears, however, that some courts treat the date of arrest as the relevant date when determining whether an individual enjoys diplomatic privileges and diplomatic immunity. *See United States v. Al–Hamdi,* 356 F.3d 564, 569 (4th Cir.2004); *United States v. Kuznetsov,* 442 F.Supp.2d 102, 105 (S.D.N.Y.2006). Because we shall hold that Diallo failed to meet his evidentiary burden of showing (continued ... ) that his father was in the United States at either time, we need not comment further here on which definitely is the relevant date for analysis.

2. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

adopt the Court of Special Appeals's recitation of the events leading to Petitioner's arrest and convictions:

On October 22, 2006, David Reeves, who had recently left a party in Rosedale, with a friend approached [Petitioner] on the street and asked if he was selling drugs. When told that [Petitioner] was not selling drugs, Reeves became angry and aggressive. Another individual, who remained unidentified in the proceedings, subsequently approached [Petitioner], offered [Petitioner] a handgun and explained that Reeves was carrying a substantial amount of money. [Petitioner] took the gun and pointed it at Reeves. When Reeves attempted to grab the gun, a struggle ensued, during which the gun fired, wounding Reeves in the neck. Reeves was subsequently treated at Franklin Square Hospital for his injuries.

On October 23, 2006, Detective Ramon Geigel visited Franklin Square Hospital to conduct an investigation of the incident. He soon learned that another individual, later identified as [Petitioner], arrived at Franklin Square Hospital at the same time as Reeves and was treated for a gunshot wound to his chest. [Petitioner] was later transferred from Franklin Square Hospital to Johns Hopkins Hospital for treatment. On October 31, 2006, Reeves identified [Petitioner] out of a photo array as the individual who shot him. [Petitioner] was arrested later that day after being discharged from Johns Hopkins Hospital. At the stationhouse, [Petitioner] was administered his *Miranda* rights and signed a waiver of those rights, ultimately confessing orally and in writing to his involvement in the shooting.

186 Md.App. at 30–31, 972 A.2d at 922 (footnote omitted).

Prior to trial, Diallo filed a motion to dismiss the indictment on the ground that the trial court lacked jurisdiction over him because he was entitled to diplomatic immunity by virtue of his father's position as a high-level official of the UN. Petitioner's father, Hama Arba Diallo (the "elder Diallo"), at the time of his son's offenses and arrest, served apparently as Executive Secretary of the United Nations Convention to

Combat Desertification [3] (the "UNCCD") and was stationed formally in Bonn, Germany. Petitioner grounded his claim of diplomatic immunity on (1) the Vienna Convention on Diplomatic Relations of 1961, 18 Apr. 1961, 23 U.S.T. 3227 (the "Vienna Convention"); (2) the Convention on Privileges and Immunities of the United Nations of 1946, 13 Feb. 1946, 21 U.S.T. 1418 (the "UN Convention"); and (3) the International Organizations Immunities Act, 22 U.S.C. § § 288–288f (2006). Diallo tendered in support of this claim an "attestation" from Frank M. Meek, Chief of Administration and Finance of the UNCCD, which we set forth below:

This is to certify that Mr. Hama Arba Diallo, a national of Burkina Faso, is the former Executive Secretary of the Permanent Secretariat of the United Nations Convention to Combat Desertification (UNCCD), and as such was the head of the UNCCD from its inception in 1999 to 19 June 2007. From 1993 to 1999 Mr. Diallo was in charge of the predecessor organization that founded the UNCCD.

In this position the former Executive Secretary held the level of Assistant Secretary General of the United Nations, which position entitled him to diplomatic status, both in Germany and on all official missions to all member country parties of UNCCD. The United States of America, since 2001, has been a party to the UNCCD, and accordingly all of Mr. Diallo's official travel to the United States of America since 2001 has been with full diplomatic status. Also, through responses to periodic inquiries of the Embassy of the United States of America in Berlin, Germany, the

---

**3.** "[D]esertification means land degradation in arid, semi-arid and dry sub-humid areas resulting from various factors, including climatic variations and human activities...." UNCCD, art. 1(a), 17 June 1994, 33 I.L.M. 1328. The UNCCD's objective

is to combat desertification and mitigate the effects of drought in countries experiencing serious drought and/or desertification, particularly in Africa, through effective action at all levels, supported by international cooperation and partnership arrangements, in the framework of an integrated approach ..., with a view to contributing to the achievement of sustainable development in affected areas. *Id.* art. 2(1).

Department of State has been notified of Mr. Diallo's position within the secretariat of the UNCCD. With the predecessor organization from 1993 to 1999, as for all United Nations personnel, all of his official travel, including to the United States of America, he had diplomatic status with respect to all of the countries, which he periodically visited while seeking the ratification of the Convention.

Since UNCCD's headquarters is situated in the Federal Republic of Germany, and not in the United States of America, the United Nations and the secretariat of the UNCCD were not required to notify the Department of State of Mr. Diallo's then current status, which was higher than the previous grades that he held while based in New York until 1993.

It should be noted that Mr. H.A. Diallo resigned his position at the secretariat effective 19 June 2007.

The motion alleged also that Petitioner was a citizen of Burkina Faso, a country in West Africa, holding a diplomatic passport from that country. Additionally, he claimed that he held an expired diplomatic identification card from the Federal Republic of Germany and current diplomatic identification papers from the UN.

The State opposed Petitioner's motion to dismiss. Attached to the written opposition was the following certification, dated 20 September 2007, from Holly S.G. Coffey, Deputy Assistant Chief of Protocol of the United States Department of State:

This is to certify that I, Holly S.G. Coffey, Deputy Assistant Chief of Protocol of the United States Department of State, am responsible for registering and maintaining the official records of diplomatic and consular officers, and other employees of foreign governments and international organizations in the United States and its territories and, in coordination with the United States Mission to the United Nations, of members of Permanent Missions to the United Nations and officials to the United Nations.

The official records of the Department of State, including those of the United States Mission to the United Nations,

indicate that Mr. Hama A. Diallo was notified by UN Secretariat to the United Nations in New York as a Special Representative of Secretary General (United Nations Conference on Environment and Development) on August 2, 1990. He served in that capacity until his assignment was terminated on June 22, 1993. At the time of Mr. Diallo's appointment, his son, Abdel Khader Diallo, was notified to the Department as a member of his family forming part of his household. Accordingly he is not entitled to diplomatic privileges and immunities in the United States.

The State contended that the Coffey certification was conclusive on the matter of whether Petitioner, through his father, enjoyed diplomatic immunity for purposes of the pending charges. The trial court denied Diallo's motion on 25 September 2007.

Petitioner then moved the court to reconsider the denial of the motion to dismiss and moved to suppress his statement to the police. Petitioner specifically argued that he enjoyed diplomatic immunity, notwithstanding the Coffey certification, because, as his father was a non-resident UN official, the UN was not required to notify the United States Department of State of the elder Diallo's change in status in 1993, which continued until 19 June 2007. At a 13 November 2007 hearing, Petitioner, in an effort to bolster his earlier assertions, presented a copy of his father's diplomatic passport from Burkina Faso and a G–4 Visa issued by the State Department. Additionally, he presented his own German diplomatic identification card. He again pressed to the court the Meek "attestation" as a conclusive document. After taking a recess to consider the additional proffers, the court denied the motion to reconsider, finding that Petitioner had not presented sufficient evidence to show that he was entitled to diplomatic immunity through his father.

Persisting, the defense moved on 27 November 2007 to alter and amend or, alternatively, to reconsider and vacate the order denying the motion to dismiss. Petitioner attached to his motion, *inter alia,* a list of the "Senior Officials of the United Nations and Officers of Equivalent Rank Whose Duty

Station is New York." The list included the elder Diallo's name and listed his position as the Executive Secretary of the UNCCD. The list reflected further that he was working "Away from Headquarters" in Bonn, Germany.

The court granted a defense request for a postponement of a hearing on the latest motion until 14 December 2007. On that date, the defense requested another continuance on the basis that it was in contact with the United States mission to the UN and was awaiting a response. The trial court denied the request and the motion. The parties proceeded to trial. As stated previously, Petitioner entered a plea of not guilty and elected a bench trial on a not guilty/statement of facts. The court found defendant guilty of first degree assault and use of a handgun in the commission of a crime of violence.

Ten days later, defense counsel filed a motion for new trial contending that he "recently discovered evidence" which required the court to exercise its revisory power under Maryland Rule 4–331 to set aside the verdict. The "recently discovered evidence," however, concededly was not available yet, so the motion stated that, upon actual receipt of the newly-discovered evidence, [defendant] will amend this Motion for New Trial and supplement it with a supporting Memorandum of Law to follow...."

The court held a hearing on the new trial motion on 8 February 2008, approximately six weeks after Petitioner filed it, at which time defense counsel requested another postponement. The only "new" evidence that defense counsel was able to muster at that time was a letter from Congressman Donald Payne of New Jersey's 10th Congressional District, which, defense counsel asserted, stated that it was the Congressman's "personal knowledge that Ambassador Diallo does enjoy diplomatic status...." The court denied the defense request for more time to develop additional evidence and denied the motion for a new trial. The court thereafter sentenced Petitioner to twenty-five years' imprisonment, with all but fifteen suspended for the first degree assault conviction. As to the

conviction for use of a handgun in the commission of a crime of violence, the court sentenced Petitioner to a concurrent five years' imprisonment.[4]

On Petitioner's direct appeal, the Court of Special Appeals decided the case in a reported opinion, *Diallo v. State*, 186 Md.App. 22, 972 A.2d 917 (2009). Before the intermediate appellate court, Petitioner advanced two primary contentions: (1) he enjoyed diplomatic immunity at the time of his arrest and (2) the failure of the United States Department of State to disclose that the elder Diallo enjoyed full diplomatic immunity and privileges when traveling in this country should be imputed to the State prosecutor and, thus, the suppressed evidence was a violation of his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[5],[6] The intermediate appellate court dismissed Diallo's appeal of the trial court's denial of his motion to dismiss because it determined that his brief did not comply with the require-

---

4. After the court sentenced Petitioner, defense counsel received a letter, dated 6 February 2009, from an official of the United States Mission to the UN. The letter stated that the elder Diallo was listed in a UN report entitled *Senior Officials of the United Nations and Officers of Equivalent Rank*, dated 31 May 2007, and that the elder Diallo would be entitled to diplomatic privileges and immunities when present in the United States. It states also that Petitioner would not be entitled to diplomatic privileges and immunities because he was a United States citizen. Although not part of the record before the Circuit Court, the letter appears in the record extract filed in this Court. As it was not part of the trial record, we shall not consider it in our analysis.

5. We shall refer to the latter claim in this opinion as the *"Brady* claim." In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218.

6. Petitioner also challenged the admissibility of his confession on voluntariness and on the ground that it was improper for the police to interrogate him because of his alleged diplomatic status. *Diallo*, 186 Md.App. at 30, 972 A.2d at 921. The Court of Special Appeals affirmed the Circuit Court. *Id.* at 64–65, 84–85, 972 A.2d at 941–42, 953–54. We declined to grant certiorari on the former issue. Petitioner did not petition for review of the latter.

ments of Maryland Rule 8–504(a)(4)–(5), by which a brief must include "[a] clear and concise statement of facts material to the determination of the questions presented ..." and an "[a]rgument in support of the party's position." The court rejected Petitioner's *Brady* claim, concluding that the State did not suppress any evidence. 186 Md.App. at 73–74, 78, 972 A.2d at 947, 949.

We granted Diallo's petition for a writ of certiorari, 410 Md. 559, 979 A.2d 707 (2009), to consider the following questions:

1. Whether the trial and intermediate appellate courts erred in holding that Petitioner did not enjoy diplomatic immunity from the criminal jurisdiction of the State of Maryland, based on the immunity of his father, a top-level U.N. diplomat, who the United Nations has certified had immunity in the U.S. at all relevant times?

2. Whether the intermediate appellate court erred when it ruled that Petitioner had waived his right to appellate challenge on appeal the (non-waivable) issue of the court's jurisdiction because he had allegedly not adhered [to] Md. Rule 8–504(a)?

3. Whether the intermediate appellate court erred when it ruled that knowledge of a manifestly erroneous certification of the U.S. Department of State, called into question by Petitioner in his Motion for New Trial, should not be imputed to the State under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and Maryland Rule 4–263, which would have obligated the State to produce all the evidence in both its and the Department of State's possession, confirming Petitioner's claim to immunity?

Additionally, we granted the State's conditional cross-petition asking this Court to consider the following question:

Did Diallo fail to preserve his claim that the prosecutor failed to comply with discovery obligations?

### ANALYSIS

## I. Partial Dismissal of Appeal in the Court of Special Appeals

The Court of Special Appeals held that Petitioner waived his right to challenge the trial court's denial of his motion to dismiss because it determined that his brief in that court did not comply with Maryland Rule 8–504(a)(4)–(5), which provides that an appellate brief shall contain "[a] clear and concise statement of facts material to the determination of the questions presented . . ." and an "[a]rgument in support of the party's position." The intermediate appellate court found Diallo's brief lacking for at least two reasons. First, the court held that the brief did not set forth a sufficient argument regarding the denial of the motion to dismiss in that it "[came] quite close in conceding that the trial court could not 'avoid' error and, consequently, did *not* err in denying appellant's motion to dismiss. . . ." 186 Md.App. at 33–34, 972 A.2d at 923–24 (emphasis in original). Second, the court found that Petitioner did not marshal any "authority in support of his argument, pertinent to a trial court's obligations in ruling upon a motion to dismiss. Instead, [Diallo] appears to bootstrap his challenge to the denial of the motion to dismiss to his argument that the prosecution suppressed evidence, in violation of *Brady v. Maryland.* . . ." *Id.* at 34, 972 A.2d at 924. The court observed also "that [Diallo] has failed to explain or refer to substantial portions of the record relevant to his argument to the trial court and the basis for the trial court's denial of his motion to dismiss, which [the court determined] are critical to determining the merits of [Diallo's] challenge to the trial court's ruling on appeal." *Id.* Accordingly, the court concluded that Diallo waived the issue and dismissed his appeal as to the denial of the motion. *Id.* Nonetheless, the appellate opinion thereafter engaged in a lengthy discussion as to why Diallo's substantive argument grounded on diplomatic immunity lacked merit.

"[A]rguments not presented in a brief or not presented with particularity will not be considered on appeal."

*Klauenberg v. State,* 355 Md. 528, 552, 735 A.2d 1061, 1074 (1999) (citing *Broadcast Equities, Inc. v. Montgomery County,* 123 Md.App. 363, 390, 718 A.2d 648, 661 (1998)). An appellate court may dismiss an appeal for a party's failure to comply with the Rule. Md. Rule 8–504(c). The intermediate appellate court found Diallo's argument lacking particularity because it made one internal cross-reference to a separate portion of the argument section in which he made his *Brady* claims. The two separate arguments were based on the same assertion, that he was entitled to diplomatic immunity and that the trial court erred in finding to the contrary. Although we are not entirely unsympathetic to our appellate colleagues' views as to Petitioner's written advocacy before them *(see infra* notes 8 and 10, for example), we conclude that the brief below was sufficient to identify facts and legal authority upon which he based his argument in his brief in that court. We thus hold that he did not waive his diplomatic immunity argument. We agree completely, however, with the intermediate appellate court's alternative conclusion that his substantive argument is without merit.

## II. Derivative Diplomatic Immunity

It is a well-established general principle of law that a diplomatic envoy is immune from the legal process of the Receiving State.[7] The U.S. Supreme Court recognized, from the earliest times of our country as a basis for this principle, that "the person of a public minister is sacred and inviolable. Whoever offers any violence to him, not only affronts the Sovereign he represents, but also hurts the common safety and well-being of nations; he is guilty of a crime against the whole world." *Respublica v. De Longchamps,* 1 U.S. 111, 116, 1 Dall. 111, 1 L.Ed. 59, 62 (1784).

In more modern times, diplomats enjoy immunity under various international treaties, including the UN Convention

---

7. A " 'Receiving State' is the country in which the diplomat is stationed and the 'Sending State' is the country he or she represents.' " *Swarna v. Al-Awadi,* 607 F.Supp.2d 509, 515 n. 6 (S.D.N.Y.2009).

and the Vienna Convention. According to the U.S. State Department, "[t]he purpose of these privileges and immunities is not to benefit individuals but to ensure the efficient and effective performance of their official missions on behalf of their governments." United States Department of State, *Diplomatic and Consular Immunity: Guidance for Law Enforcement and Judicial Authorities* 2 (1998 rev. ed.) [hereinafter *Diplomatic and Consular Immunity*]. *See also* UN Convention, art. V, § 20 ("Privileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves."). Generally, the spouse and other members of the household and the diplomat's staff also enjoy the same diplomatic immunities and privileges as the diplomat. Vienna Convention, art. 37(1); UN Convention, art. V, § 19.

The Diplomatic Relations Act of 1978, 22 U.S.C. § 254d (2006) provides:

> Any action or proceeding brought against an individual who is entitled to immunity with respect to such action or proceeding under the Vienna Convention on Diplomatic Relations . . ., or under any other laws extending diplomatic privileges and immunities, shall be dismissed.

Thus, if an individual is entitled to immunity, a court must dismiss the matter because it lacks subject matter jurisdiction over the defendant. *See Swarna v. Al-Awadi*, 607 F.Supp.2d 509, 515 (S.D.N.Y.2009) (noting that when raised, diplomatic "[i]mmunity must be determined at the outset because it implicates the Court's subject matter jurisdiction."). *See also Brzak v. United Nations*, 597 F.3d 107, 114 (2d Cir.2010) (upholding the district court's dismissal for lack of subject matter jurisdiction because defendants were entitled to diplomatic immunity). The individual claiming immunity from prosecution bears the burden of showing that he or she is entitled to immunity. *See Burns v. Reed*, 500 U.S. 478, 486, 111 S.Ct. 1934, 1939, 114 L.Ed.2d 547, 558 (1991) (stating that where a defendant claims prosecutorial immunity from suit, he or she "bears the burden of showing that such immunity is

justified for the function in question."); *O'Bryan v. Holy See,* 556 F.3d 361, 376 (6th Cir.2009) (explaining that the party claiming sovereign immunity under the Foreign Sovereign Immunities Act (the "FSIA") "bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state...."); *Alberti v. Empresa Nicaraguense De La Carne,* 705 F.2d 250, 253 (7th Cir.1983) (noting that under the FSIA, defendants bear the burden of establishing their immunity). *See also Staley v. Staley,* 251 Md. 701, 705, 248 A.2d 655, 658 (1968) ("The burden of proof in establishing lack of jurisdiction ... is upon the person alleging it.").

■ Whether a diplomat is entitled to immunity is typically a mixed question of law and fact. *United States v. Al–Hamdi,* 356 F.3d 564, 569 (4th Cir.2004). As such, courts "review such questions 'under a hybrid standard, applying to the factual portion of each inquiry the same standard applied to questions of pure fact and examining de novo the legal conclusions derived from those facts.'" *Id.* (quoting *Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond,* 80 F.3d 895, 905 (4th Cir. 1996)).

■ "Generally an individual must be accredited by the State Department as a diplomatic official in order to be entitled to full diplomatic immunity." Ved P. Nanda & David K. Pansius, *Litigation of International Disputes in U.S. Courts* § 4:4 (2d ed. 2010). Typically, in the more common situation of a diplomat to a mission of a traditional foreign State (as opposed to an international organization such as the UN), when a person asserts diplomatic immunity from prosecution or suit, the law enforcement officer should verify the party's diplomatic status with the State Department. *Diplomatic and Consular Immunity, supra,* at 16; Nanda & Pansius, *supra* at § 4:4. In the situation of a representative of a traditional foreign State, courts generally give the State Department's certification substantial deference in its consideration of diplomatic status. *In re Baiz,* 135 U.S. 403, 431–32, 10 S.Ct. 854, 862, 34 L.Ed. 222, 231 (1890); *Al–Hamdi,* 356 F.3d at 571; *Traore v. State,* 290 Md. 585, 589, 431 A.2d 96, 98

(1981); *Haley v. State,* 200 Md. 72, 82, 88 A.2d 312, 317 (1952). "A principal reason underlying judicial deference to the executive branch of the federal government in certain matters involving foreign governments is the principle that courts should 'not so exercise their jurisdiction . . . as to embarrass the executive arm of the Government in conducting foreign relations.' " *Traore,* 290 Md. at 591, 431 A.2d at 99 (alteration in original) (quoting *Ex parte Republic of Peru,* 318 U.S. 578, 588, 63 S.Ct. 793, 799, 87 L.Ed. 1014, 1020 (1943)). We, however, do not review the State Department's conclusions of law with regard to the interpretation of a statute on a deferential standard. *Id.* at 592, 431 A.2d at 99–100.

Ascertaining the diplomatic status, *vel non,* of an individual claiming diplomatic immunity based on his or her involvement with the UN, rather than a traditional foreign State, requires a different and more complex analysis. At least two scholars point out, albeit discussing the immunity of the UN as an entity rather than that of a UN official, that "[t]heorists who attempt to explain the international immunities of the United Nations face what has been called a 'bewildering array of instruments,' an 'inconsistency of practice,' a 'multiplicity of applicable instruments,' and a 'bizarre drafting of provisions.' " Linda S. Frey & Marsha L. Frey, *The History of Diplomatic Immunity* 559 (1999).

■ In the case of a UN official, the United Nations is essentially the receiving State and, as such, the "United States has no say or veto power with respect to such representative of any member state." *United States v. Fitzpatrick,* 214 F.Supp. 425, 433 (S.D.N.Y.1963). Thus, when a law enforcement officer encounters a suspect who claims that he or she is a UN official or claims immunity through such a person, the officer should verify the diplomatic status of the UN official with the United States Mission to the UN. *Diplomatic and Consular Immunity, supra,* at 16.

In the context of the present case, the Coffey certification would be inconclusive with regard to the elder Diallo's diplomatic status in 2006 and we shall not consider the certification

further in our analysis. Moreover, the State appears to concede that the Coffey certification is incomplete and possibly incorrect in its conclusion and that, by virtue of the United States' adoption of the Vienna Convention, any protection accorded to UN officials was available to the elder Diallo *when present in the United States* (before he resigned his UN position).

■■ Petitioner alleges, and the State concedes, that his father was a senior UN official entitled to diplomatic immunity under certain circumstances. He contends further that, as a member of his father's household, he enjoyed derivative diplomatic immunity under the Vienna Convention and the UN Convention, to the extent his father enjoyed it at the critical time(s) significant to our analysis. He claims that he is immune from prosecution pursuant to the UN Convention, the Vienna Convention, the International Organizations Immunities Act, 22 U.S.C. §§ 288–288l,[8] and the Diplomatic Relations Act, 22 U.S.C. § 254a. The State retorts that he failed to establish before the trial court that his father enjoyed diplomatic immunity on the date(s) in question, and, thus, Diallo enjoyed nothing derivatively.[9]

As a then UN Assistant Secretary–General, the principal source of the elder Diallo's immunity was the UN Convention. The UN Convention grants to the Secretary–General and all Assistant Secretaries–General (and their spouses and minor children) "the privileges and immunities, exemptions and facil-

---

**8.** Diallo's brief before this Court mentions the International Organizations Act, but does not contain an argument or a discussion with regard to why he is immune under that Act. Furthermore, he does not provide the text of the statute in his brief or appendix. As such, we shall not consider this argument. *See* Md. Rule 8–504(a)(5).

**9.** The State argues further that even if the elder Diallo was entitled to diplomatic immunity, Petitioner does not enjoy derivative immunity simply by virtue of the fact that he is his father's son because he does not form a part of his father's household, pointing out that Diallo was a student living in the Baltimore area. Because we conclude that Diallo failed to establish that his father enjoyed diplomatic immunity at the relevant time(s), we shall not reach the question of whether he formed a part of his father's household.

ities accorded to diplomatic envoys, in accordance with international law." UN Convention, art. V, § 19. The scope of that immunity under "international law" is the immunity described in the Vienna Convention. *See Brzak,* 597 F.3d at 113; *Ahmed v. Hoque,* 2002 WL 1858776, at *5, 2002 U.S. Dist. LEXIS 14852, at *13–14 (S.D.N.Y. 14 Aug. 2002) ("The scope of immunity extended to diplomatic envoys, and accordingly the scope of immunity to be extended to United Nations representatives, is that set out in the Vienna Convention. . . .").

Here, Petitioner argued to the trial court in his motion to dismiss, other papers filed in the Circuit Court, and at the 13 November 2007 hearing that, pursuant to Article IV, § 11 of the UN Convention, he was entitled to full diplomatic immunity and privileges.[10] That section provides, in pertinent part:

---

**10.** In his brief, however, Petitioner shifts the ground of his entitlement to immunity to Article V, §§ 17–18 of the UN Convention. Those sections provide, in pertinent part:

SECTION 17. The Secretary–General will specify the categories of officials to which the provisions of this Article and Article VII shall apply. He shall submit these categories to the General Assembly. Thereafter these categories shall be communicated to the Governments of all Members. The names of the officials included in these categories shall from time to time be made known to the Governments of Members.

SECTION 18. Officials of the United Nations shall:

(a) be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity.

Petitioner does not acknowledge or explain in his brief why he has changed his argument regarding the exact provision or provisions from which his claim to derive diplomatic immunity springs. He provides no argument as to the reasons the UN Convention entitles him to diplomatic immunity and made no attempt to marshal the benefit of any other authority. We acknowledge his contention, in another section of his brief, that the issue of diplomatic immunity may be raised at any time because it implicates subject matter jurisdiction, but he has not raised this contention with regard to Article V of the UN Convention. As such, we decline to consider his argument that he was entitled to immunity under Article V. *See* Md. Rule 8–504(a)(5)–(c) (stating that a brief shall include an "[a]rgument in support of the party's position" and is subject to dismissal for failure to do so).

Even if we were to consider Article V, the result would not change. The elder Diallo would be entitled to the immunity described in Article V only when and if he were present in the United States. Because

Representatives of Members to the principal and subsidiary organs of the United Nations and to conferences convened by the United Nations, shall, while exercising their functions and during their journey to and from the place of meeting, enjoy the following privileges and immunities:

(a) immunity from personal arrest or detention and from seizure of their personal baggage, and, in respect of words spoken or written and all acts done by them in their capacity as representatives, immunity from legal process of every kind.

UN Convention, art. IV, § 11. That section limits the official's immunity to "functional immunity," i.e., immunity for acts exercised in the performance of his or her official duties.

Under the Vienna Convention, "[a] diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State." Art. 31(1). Article 39(1) states that "[e]very person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post...." When that person's diplomatic functions come to an end in the Receiving State, "such privileges and immunities shall normally cease at the moment when he leaves the country.... However, with respect to acts performed by such person in the exercise of his functions as a member of the mission, immunity shall continue to subsist." Vienna Convention, art. 39(2). Article 37(1) of the Vienna Convention provides that "[t]he members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29–36."

▪ Accordingly, if the elder Diallo was present in the United States at the time the offense occurred or perhaps when Petitioner was arrested, Diallo may have been entitled to absolute immunity. If the elder Diallo was absent, however, he would be entitled at most only to functional immunity.

---

Diallo failed to present sufficient evidence to the trial court that the elder Diallo was present in the United States at the critical time(s), he likewise is not entitled derivatively to absolute immunity.

Vienna Convention, art. 39(2); *see also Brzak*, 597 F.3d at 113 (former UN officials no longer in the country enjoy only functional immunity); *Swarna*, 607 F.Supp.2d at 515–16 (former UN official entitled only to functional immunity).

In *Swarna v. Al-Awadi*, 607 F.Supp.2d at 511–12, a former domestic employee brought suit in the U.S. against her former employer, the employer's wife, and the State of Kuwait. The former employer was a diplomat serving in New York City with the Permanent Mission of the State of Kuwait to the United Nations. *Id.* At the time the former employee brought suit, her former employer lived in Paris, France. *Id.* at 512. The individual defendants claimed diplomatic immunity under, *inter alia*, the Vienna Convention and the Diplomatic Relations Act. *Id.* The court determined that the former diplomat was not entitled to "residual diplomatic immunity" because his employment of a domestic servant was a private act and bore no official relation to the functions of a diplomatic mission. *Id.* at 520. With respect to the former diplomat's wife, the court held that, although Article 37 of the Vienna Convention (providing for diplomatic immunity of diplomat's family members) does not provide expressly for residual diplomatic immunity to family members once they have left the country, it "need not decide whether, if Mr. Al–Awadi were entitled to residual diplomatic immunity under Art. 39, such immunity would also extend to [his wife]. [She] has no greater entitlement to immunity than does Mr. Al–Awadi." *Id.* at 522. Because the court held that the husband was not entitled to diplomatic immunity, the court determined that "it follows that [the plaintiff's claims] are also not barred with respect to [the wife]." *Id.*

Under the plain language of the Diplomatic Relations Act, § 254d, if Petitioner was entitled to diplomatic immunity under the UN Convention and the Vienna Convention at the time the offense occurred or when he was arrested, the trial court should have dismissed the charges against him. The parties do not dispute that the elder Diallo must have been present in the United States on the date in question in order for Petitioner to enjoy derivative immunity from criminal

prosecution. The State argues, however, that Petitioner did not present sufficient evidence to compel the trial court to conclude that the elder Diallo was present in the United States on either potentially relevant date. Petitioner contends that he presented sufficient evidence in his pre- and post-trial motions to show that the elder Diallo had diplomatic status at the time of the subject offenses, namely a letter from the UN Secretary–General, Kofi Annan, appointing the elder Diallo, a June 2006 list of the UN Assistant Secretary–Generals, and the Meek attestation. The only "new" evidence presented to the trial court at the hearing on Petitioner's motion for a new trial was the letter from Congressman Payne. Diallo, however, merely alleged in his brief that his father was in New York at the critical time(s), meeting with former United States UN Ambassador, Andrew Young. Yet, Diallo did not offer to the trial court any documentary or testimonial proffer of evidence to support the latter assertion.[11] The sum of the evidence actually generated before the Circuit Court showed only that his father was an Assistant Secretary–General at the time of the crimes and Diallo's arrest, not that the elder Diallo was in the United States performing any official UN functions at those times.[12]

We hold, therefore, that the trial court did not err in denying the motion to dismiss on the ground that Petitioner

---

**11.** We note that Petitioner did not include a reference to the record to support the assertion he made in his brief when he stated that "at the time of the subject offenses, the elder Diallo was in the U.S. for meetings with former United States Ambassador to the United Nations, Andrew Young, in Atlanta, in furtherance of his UNCCD mission." He later corrected this statement to claim that the elder Diallo met with Ambassador Young in New York. No matter how he parsed the claim, there was no record evidentiary support before the trial court for the occurrence of this meeting and we shall not consider this bald assertion in our analysis.

**12.** We note that some of the "evidentiary" record alluded to and "refined" legal arguments advanced in Petitioner's brief were developed after the trial court convicted and sentenced Petitioner. Thus, the issue of whether Petitioner was entitled to diplomatic immunity became something of a moving target for much of the pretrial, trial, postverdict, and appellate proceedings.

had not proven he enjoyed immunity under the Vienna Convention because he did not present sufficient evidence that he enjoyed immunity under the UN Convention.

## III. Petitioner's Brady Claim

### A. Preservation

Petitioner contends that the U.S. State Department violated its obligation to exercise due diligence and produce exculpatory materials related to his father's diplomatic status. He perceives this alleged failure to be a violation of his due process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. The State counters initially that the *Brady* issue is not properly before this Court because Petitioner neglected to preserve his *Brady* argument by failing to raise it in the trial court and, thus, there is no trial court ruling for us to review.

"Ordinarily, [an] appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court...." Md. Rule 8–131. We have stated repeatedly that the primary purpose of Maryland Rule 8–131 is " 'to ensure fairness for all parties in a case and to promote the orderly administration of the law.' " *Conyers v. State,* 367 Md. 571, 594, 790 A.2d 15, 29 (2002) (quoting *State v. Bell,* 334 Md. 178, 189, 638 A.2d 107, 113 (1994)). Petitioner never argued explicitly, before conviction by the trial court, that the State Department's failure to recognize that the elder Diallo was a diplomat was a violation of his due process rights under *Brady.* He did assert, however, in a motion for a new trial, that he had "recently discovered evidence" which required the court to exercise its revisory power under Maryland Rule 4–331 [13] and set aside the verdict.

---

**13.** Petitioner moved the court to grant a new trial specifically under Maryland Rule 4–331(a) and (b) on the ground that he had newly discovered evidence. Maryland Rule 4–331(c), not mentioned in his motion, gives the court discretion to grant a new trial on the ground of newly discovered evidence. Maryland Rule 4–331 provides in pertinent part:

He stated that he would "present evidence from the United States Department of State that will directly controvert" the Coffey certification.[14] The Court of Special Appeals held that the motion for a new trial, asserting that Diallo had recently discovered evidence, preserved sufficiently a *Brady* argument. 186 Md.App. at 71, 972 A.2d at 945. We shall not disturb that conclusion.

## B. *The Alleged Brady Violation*

 The Court of Special Appeals held that the State did not violate Petitioner's right to due process of law under *Brady*. *Diallo*, 186 Md.App. at 72, 972 A.2d at 946. The intermediate appellate court concluded that there was no suppression and, furthermore, that any latent knowledge that the State Department possessed regarding Diallo's diplomatic status could not be imputed to the Maryland prosecutor. *Id.* at 78, 972 A.2d at 949. We shall affirm and hold that the Petitioner did not demonstrate that the State of Maryland was

(a) Within ten days of verdict. On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

(b) Revisory power. The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:

(1) in the District Court, on motion filed within 90 days after its imposition of sentence if an appeal has not been perfected;

(2) in the circuit courts, on motion filed within 90 days after its imposition of sentence.

Thereafter, the court has revisory power and control over the judgment in case of fraud, mistake, or irregularity.

(c) Newly discovered evidence. The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

(1) on motion filed within one year after the date the court imposed the sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later.

14. It should be noted that the defense actually did not present any new evidence from the State Department until after Petitioner was sentenced, nor did it subpoena any one from the State Department in an attempt to ascertain precisely the State Department's final position.

responsible for the suppression or withholding of evidence related to the diplomatic status of the elder Diallo.

In *Brady,* the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218. At the time of Petitioner's trial in 2007, the then current iteration of Md. Rule 4–263(a) required the State to turn over to the defense, without the necessity of a request, *inter alia,* "[a]ny material or information tending to negate or mitigate the guilt or punishment of the defendant as to the offense charged."

To establish a *Brady* violation, Petitioner must establish three necessary components: "(1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." *Conyers,* 367 Md. at 597, 790 A.2d at 30. Suppressed evidence, for *Brady* purposes, is " 'information which had been known to the prosecution but unknown to the defense.' " *Id.* at 601, 790 A.2d at 33 (quoting *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 557 (4th Cir.1999)).

In the present case, Petitioner argues specifically that the prosecution, through its alleged "agent," the State Department, suppressed evidence regarding his father's correct diplomatic status. The State Department was the agent of the prosecutor because, according to Petitioner, it investigated and opined on Petitioner's claim of diplomatic immunity. He contends that the State Department had actual knowledge that he was entitled to diplomatic immunity and that it chose not to convey this information to the prosecutor. He argues further that the State should have verified better the accuracy of the Coffey certification. The failure to present evidence refuting that certification was not his fault, he concludes, because the certification of diplomats is the government's job

alone, not Petitioner's responsibility to investigate and discover.

### i. Suppression

■ Neither the prosecutor's negligence, willfulness, or lack of bad faith in failing to produce exculpatory or impeachment information bears on our consideration of whether the defendant's right to due process was violated under *Brady*. *See Strickler v. Greene,* 527 U.S. 263, 288, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286, 306 (1999) ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment."); *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342, 353 (1976) (opining that "[n]or do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor."); *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."); *Ware v. State,* 348 Md. 19, 38, 702 A.2d 699, 708 (1997) ("The failure of the prosecutor to disclose favorable, material evidence violates due process without regard to the good faith or bad faith of the prosecutor."). The defendant need only demonstrate that the evidence was in the possession of the prosecution, or someone working on its behalf, and that the prosecution did not produce the evidence to the defense.

■ "*Brady* offers a defendant no relief when the defendant knew or should have known facts permitting him or her to take advantage of the evidence in question or when a reasonable defendant would have found the evidence." *Ware,* 348 Md. at 39, 702 A.2d at 708. We glean from his brief that Diallo contends that the State Department had actual knowledge that his father was a diplomat at the time(s) in question and that his father's status entitled Petitioner to full diplomatic immunity and privileges. He concedes that he had conflicting information from the State Department at the time of his trial, yet continues to argue that there was a suppression of evidence and that he was in contact with various State Depart-

ment employees throughout most of the proceedings in the trial court.

■ All of the category of evidence that Petitioner claims the State suppressed was known to him or he was in a unique position to obtain. The parties agree that if the elder Diallo was in the United States at the time Petitioner committed the crimes and/or at his arrest, Diallo would have a viable claim of derivative diplomatic immunity. As discussed, *supra*, however, he (as a putative member of his father's household) never presented any actual evidence that his father was in the United States at the time of the crime or his arrest. Petitioner's counsel knew of the elder Diallo's status as a high level UN official as early as the filing of the motion to dismiss (and obviously somewhat earlier), as indicated by the inclusion of the Meek attestation as an exhibit. Surely, his father's whereabouts and current job title were facts known to Diallo, or at least was information more accessible to his inquiry than the prosecution. As stated previously, Petitioner has the burden of showing that he is entitled to immunity, not the State. Such evidence as he adduced, which he claims called into doubt the Coffey certification, was evidence that he obtained. We agree with the Court of Special Appeals that "[t]here can be no *Brady* violation where there is no suppression of evidence." *Diallo*, 186 Md.App. at 73–74, 972 A.2d at 947. We hold that, under the facts and record in this case, the State did not suppress evidence.[15]

Diallo argues also that the prosecution had an affirmative duty to verify the Coffey certification and that the failure to do so amounts to a suppression of *Brady* information. We acknowledge that we stated in *State v. Williams*, 392 Md. 194, 210, 896 A.2d 973, 982 (2006), that "when the reliability of a witness is determinative of guilt or innocence, nondisclosure of such evidence falls within *Brady*." As we discuss more fully *infra*, however, Petitioner does not allege that the Maryland

---

**15.** Because we hold that the State did not suppress evidence known to it, we shall not include an analysis of whether the claimed evidence was favorable to Petitioner or material.

prosecutors possessed actual knowledge that the Coffey Certification was incorrect. Accordingly, we hold that there was no suppression.

### ii. By the Prosecutor

At the outset, it should be noted that Petitioner failed to cite a single case in his brief, other than *Giglio* and then only for general background purposes, for the proposition that the knowledge of the U.S. State Department should be imputed to the State's Attorney for Baltimore County or his assistant prosecutors. Instead, he argues rather baldly that the intermediate appellate court erred by concluding that the State Department's knowledge should not be imputed to the prosecutors in his case.

"Essential to the inquiry into whether a *Brady* violation has occurred is the determination of who has the obligation to disclose and of what that obligation consists." *Williams*, 392 Md. at 211, 896 A.2d at 982. It is well settled that under *Brady* and its progeny the "prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490, 508 (1995). This duty requires the prosecutor "to make a reasonable inquiry of those in a position to have relevant knowledge . . . ." *Williams*, 392 Md. at 226, 896 A.2d at 991. Failure to do so is "appealable error." *Id.*

The knowledge or possession of exculpatory or impeachment information is not limited to knowledge held directly by the prosecutor in the case, but has been extended to include information known by other prosecutors in the same office. In *Giglio*, the Supreme Court held that a prosecutor's office is a single entity and, accordingly, the knowledge of one prosecutor is imputed to the entire office. 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109. *See also Williams*, 392 Md. at 211, 896 A.2d at 983 (holding that "the disclosure obligation imposed by *Brady* does, in fact, apply to information possessed by other prosecutors in the same office.").

■■■ The question we must decide is whether the Department of State's putative knowledge with respect to the elder Diallo's diplomatic status, other than as revealed in the Coffey certification, may be imputed fairly to the prosecutor in this case. Where two jurisdictions engage in joint investigations, courts generally hold that the prosecutor has constructive possession of any evidence possessed by the other party to the investigation. For example, in *United States v. Antone*, 603 F.2d 566, 569–70 (5th Cir.1979), the federal Court of Appeals for the Fifth Circuit imputed the knowledge of state investigative agents to federal prosecutors. In that case, the Florida Department of Criminal Law Enforcement ("FDCLE") paid for a witness's legal representation. *Id.* at 568. Upon learning of this fact after the trial, the federal prosecutor promptly informed the court. *Id.* The Federal Bureau of Investigation ("FBI") agents and FDCLE participated in a joint task force to investigate the crime for which Antone was convicted. *Id.* The court declined to "impos[e] a rigid distinction between federal and state agencies...." *Id.* at 570. Instead, the court chose to adopt a "case-by-case analysis of the extent of interaction and cooperation between the two governments." *Id.* Applying that analysis and observing that investigation "was marked by [a] spirit of cooperation," the court held that based on the fact "that the two governments, state and federal, pooled their investigative energies to a considerable extent," the state agents were part of the prosecutorial team. *Id.* at 569–70. Thus, the federal prosecutor had constructive knowledge of the agreement to pay the witness's legal fees. *Id.* at 570.

*United States v. Risha*, 445 F.3d 298 (3d Cir.2006), is instructive also. In that case, a U.S. District Court concluded that the government's key witness in a federal prosecution expected leniency from state officials on unrelated state charges, in exchange for his testimony against Risha in a federal case and ordered a new trial. *Id.* at 299. The federal Court of Appeals for the Third Circuit determined that the trial court did not make proper factual findings and remanded the case for a factual determination of whether the prosecutor

was in constructive possession of *Brady* material; the court offered guidance to the trial court in making the determination of the extent of cross-jurisdictional cooperation. *Id.* The appellate court adopted the case-by-case analysis of Antone and identified three factors to consider when determining questions of cross-jurisdiction constructive knowledge:

(1) whether the party with knowledge of the information is acting on the government's "behalf" or is under its "control"; (2) the extent to which state and federal governments are part of a "team," are participating in a "joint investigation" or are sharing –30–resources; and (3) whether the entity charged with constructive possession has "ready access" to the evidence.

*Id.* at 304.

In *United States v. Reyeros*, 537 F.3d 270, 285 (3d Cir.2008), the court applied the factors in *Risha* and held that the federal prosecutor did not have constructive possession of documents in the possession of the government of the nation of Colombia. In *Reyeros*, a man was arrested in Colombia for drug trafficking and conspiracy. *Id.* at 274, 280. The United States government sent to the Colombian government a request to interview the man using questions provided by the United States and to receive back a written summary of his answers. *Id.* at 280. The Colombian authorities complied with the request (in the presence of United States Custom officials), but also permitted the Customs investigators to interview the man. *Id.* The United States asked Colombia to extradite the witness, which he opposed. *Id.* He was extradited eventually to the United States. *Id.* When it became apparent that the witness would testify against Reyeros and several other defendants, defense counsel asked the trial court to compel the Government to obtain and produce any documents that the witness filed with the Colombian authorities to oppose extradition, under the theory that "the prosecution constructively possessed any documents possessed by the Colombian authorities relating to [his] extradition because Colombia had cooperated with the United States officials to interview [him] and by acting upon the United States' request

to extradite him." *Id.* The Government opposed the motion, but stated that it was attempting to obtain the information from the Colombian government. *Id.* The District Court denied the discovery request. *Id.*

The appellate court, applying the case-by-case analysis urged in *Antone* and considering the *Risha* factors, held that the standards had not been met. *Id.* at 283. The court distinguished the facts in *Reyeros* from those of *Antone:* "Unlike the state agents in *Antone,* Colombian authorities did not function as agents of the United States government. It is true that the Colombian government acted at the request of the prosecution in permitting the federal investigators to interview [the witness]; however, beyond the initial recitation of officially propounded questions, no Colombian officials participated in that interview or any other part of the investigation." *Id.* The Colombian officials acted on its own behalf in asking the questions, not as an agent of the United States. *Id.* The court "decline[d] to adopt the defendants' suggestion that a determination of constructive possession is appropriate whenever a foreign government responds to a request from the United States for investigative or judicial assistance." *Id.*

As to the second factor, whether the two governments were acting as a team and participated in a joint investigation, the court concluded that there was not a joint investigation between the United States and Colombian governments. *Id.* In reaching that conclusion, the court relied on the fact that the two governments *did not share their investigative resources.* *Id.*

As to the third and final factor, whether the prosecutor had "ready access" to the information, the court concluded that the prosecution "did not have access to the documents in [the witness's] Colombian court file, aside from those documents it was able to obtain from [his] attorneys in Colombia." *Id.* at 284. The court observed that the ability to acquire the evidence is not the determinative factor. *Id.* "The mere fact that documents may be obtainable is insufficient to establish constructive possession." *Id.* To establish constructive posses-

sion, the defendant must show that the requested evidence is in the possession of "people engaged in the investigation or prosecution of the case." *Id.* As noted previously, the defendant did not satisfy that standard and the court held that the federal prosecutor did not have constructive possession of the documents. *Id.* at 285. *See also Moon v. Head,* 285 F.3d 1301, 1310 (11th Cir.2002) (adopting *Antone's* case-by-case analysis and holding that a Georgia prosecutor did not have constructive knowledge of evidence known to Tennessee agencies, notwithstanding the fact that a Tennessee investigator was a witness in the Georgia trial, because the two states shared neither resources nor labor, Tennessee investigators did not act as agents for Georgia investigators, and the Tennessee investigators were not under the supervision of Georgia officials); *United States v. Beers,* 189 F.3d 1297, 1304 (10th Cir.1999) (where there is no indication of a joint effort between state and federal governments, state's knowledge of impeachment evidence may not be imputed to federal prosecutor).

Even where two federal departments participated in a joint investigation, the Third Circuit held that the knowledge of one "sovereign" could not be imputed to the other "sovereign." In *United States v. Pelullo,* 399 F.3d 197, 218 (3d Cir.2005), the federal Department of Labor ("DOL") participated in an investigation with federal prosecutors. Notwithstanding that fact, the court held that information known to employees of a certain bureau of the DOL could not be imputed to federal prosecutors because there was no indication that the prosecution and the bureau engaged in a joint investigation or shared resources, and because the prosecution did not have any control over the bureau officials who were collecting the information. *Id.*

Other courts that have not applied expressly the *Risha* factors nonetheless reach generally the same conclusion that the level of involvement in the investigation of the party with actual knowledge or possession at issue will determine whether that knowledge will be imputed to the prosecutor. For example, in *Commonwealth v. Lykus,* 451 Mass. 310, 885

N.E.2d 769, 782–83 (2008), the Supreme Judicial Court of Massachusetts imputed the knowledge of the FBI to Commonwealth prosecutors because the prosecution was the product of a joint investigation between the Commonwealth and the FBI. Nineteen FBI agents testified at the trial. *Id.* at 783. The court opined that "in dual sovereign situations, where a 'motion [for exculpatory evidence] is allowed ... cooperation between State and Federal prosecutors is and should be common enough so that the burden of securing Federal cooperation should be placed on the State prosecutor rather than on the defendant.'" *Id.* at 782 (alteration in original) (quoting *Commonwealth v. Liebman,* 379 Mass. 671, 400 N.E.2d 842, 844 (1980)). *See also Lovitt v. True,* 403 F.3d 171, 185–86 (4th Cir.2005) (noting that although the prosecutor has a duty to learn of favorable evidence known to others acting on its behalf, a county prosecutor did not have duty to learn of cases in surrounding jurisdictions where its witness, allegedly a "professional snitch," testified on behalf of or cooperated with the government).

In the present case, Petitioner argues that the "Department of State *directed* the State's investigation on Petitioner's claim of diplomatic pedigree." He contends that the intermediate appellate court's decision was in error for two reasons: first, he argues that the case law relied on by the intermediate appellate court is inapt because the State Department and the prosecutor did not participate in a joint investigation.[16] That very reason, which he urges requires reversal, indicates to us that the case law is relevant and requires affirmance of his convictions. The cases discussed *supra* do not all involve joint investigations. For example, in *Reyeros,* there was not a joint investigation between the United States and the Colombian government. The court found that fact particularly relevant in determining that the prosecutor in *Reyeros* did not have constructive knowledge of any information known only to Colombian officials.

---

16. Despite his argument that the cases addressing cross-jurisdiction constructive knowledge are inapposite here, he provides no alternative authority to bolster his position.

Second, he argues, somewhat inexplicably, that the State Department was "actively involved" because the prosecutor, according to the Petitioner, *"elicited* the Department of State of the United States Government, to conduct an 'investigation' of its records for a certification only on the threshold immunity issue, and on that issue the Department of State was not only actively involved; rather the erroneous certification became the evidentiary axis around which the entire proceeding revolved." It is somewhat unclear to us what he means by this statement, but we understand him to mean that the State Department was an active member of the investigation, a contradiction of his previous argument. Whatever the intended meaning of this argument, we agree with Petitioner's first contention, that the State Department and the prosecutor did not participate in a joint investigation in this case.

 Although different courts may apply different tests to the same question, it is clear to us that the proper inquiry is to examine, on a case-by-case basis, "the extent of interaction and cooperation between the two governments." *Antone,* 603 F.2d at 570. We find an application of the factors enunciated in *Risha* plumbs adequately the extent of interaction and investigative cooperation between two governments for the purposes of the issue before us.

 Applying those three factors to the record of the present case, we conclude that the prosecution did not have constructive knowledge or possession of any alleged latent knowledge of the State Department with regard to Petitioner's or his father's correct diplomatic status. The first *Risha* factor asks "whether the party with knowledge of the information is acting on the government's 'behalf' or is under its 'control.'" 445 F.3d at 304. Here, the party purported to have knowledge of the Diallos' diplomatic status, according to Petitioner, is the United States Department of State.[17] There is

---

**17.** Petitioner asserts this now, notwithstanding his claim in the trial court that the UN was not required to notify the Department of State of the elder Diallo's change in status. *See supra* p. 6.

no allegation that the State Department was under the control of the Baltimore County State's Attorney office. We also conclude (readily) that the State Department was not acting on the behalf of the State of Maryland. The State Department, similar to the Colombian government in *Reyeros*, merely was responding to a request from the State when Coffey issued her certification. Coffey was acting on behalf of the State Department, not the State of Maryland. We decline to hold, as a general proposition, that because a prosecutor asks a federal agency or official for information, all of the latent knowledge of that federal department, agency, or official may be imputed to the State.

The second *Risha* factor similarly does not support Petitioner's argument that we should impute the State Department's knowledge to the prosecutor in the present case. This factor, closely related to whether the other party is acting on behalf of the prosecutor, considers "the extent to which state and federal governments are part of a 'team,' are participating in a 'joint investigation' or are sharing resources...." *Risha*, 445 F.3d at 304. Petitioner attempts to paint the prosecutor's request to the State Department for a certification of diplomatic status as the forming of a "team" between the prosecutor's office and the State Department. He argues that because the State Department "actively counsels police" to contact the Department when an arrestee asserts a claim of diplomatic privilege the State Department becomes part of the investigation. The State Department was not involved in this investigation. This was not a joint investigation. The State Department only undertook in the present case to issue the Coffey certification. To argue that that fact alone transforms the two entities into a team is extreme overreaching. Furthermore, there is no allegation that the State Department and the State of Maryland pooled labor or resources in any way during the State's investigation of Petitioner. Unlike *Antone*, the investigation here was not marked by a "spirit of cooperation." 603 F.2d at 569. We hold that the prosecutor and the State Department were not part of a team that participated in a joint investigation or shared resources.

The third *Risha* factor also directs our holding regarding this argument. The prosecutor did not have "ready access" to the evidence. The prosecutor asked the State Department for a certification of Petitioner's diplomatic status. The record in this case does not suggest that the State had the ability to inspect or access easily the State Department's records. Perhaps the State could have issued subpoenas for the information, but it appears that the State, at the time the trial court denied the motion to dismiss, labored under the belief, albeit wrong perhaps, that the Coffey certification was correct. Petitioner had an equal opportunity to subpoena the State Department, or anyone else it believed was in possession of exculpatory evidence, but he did not choose that course of action. He failed to show that any suppressed evidence was in the possession of "people engaged in the investigation or prosecution of [his case]." *Reyeros*, 537 F.3d at 284. Although we do not conclude necessarily that the prosecutor had the ability to acquire the evidence, we agree with the Third Circuit that the ability to acquire evidence is not the determinative factor where there is no showing that the evidence was in the possession of people engaged in the prosecution or investigation of the case. *Reyeros*, 537 F.3d at 284. Ultimately, we conclude that Petitioner's right to due process was not violated under *Brady* and its progeny because there was no suppression of evidence by the State.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS DISMISSING THE APPEAL IN PART VACATED; JUDGMENT OF THAT COURT AFFIRMED OTHERWISE; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. COSTS TO BE PAID BY PETITIONER.**